(REV.5/85) Criminal Complaint TINOS DIAMANTATOS, AUSA (312) 353-4317

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

FILED
JAN 1 3 2010 NF
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE NOLAN

UNITED STATES OF AMERICA

v.

JACK MANN

CRIMINAL COMPLAINT

CASE NUMBER: 10 CR 0035

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

Between in or around August 2009 and continuing through on or about January 13, 2010, in Cook County, and elsewhere, in the Northern District of Illinois, defendant did,

intend that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, namely, Title 18, Unites States Code, Sections 111, 115(a)(1)(B), and 1114, and under circumstances strongly corroborative of that intent, solicited, commanded, induced, and otherwise endeavored to persuade such other person to engage in such conduct,

in violation of Title 18 United States Code, Section 373(a).

I further state that I am a(n) Special Agent, FBI, and that this complaint is based on the following facts:
Official Title

See Attached Affidavit.

Continued on the attached sheet and made a part hereof: X Yes ___ No

[signature] SA 1955
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 13, 2010 at Chicago, Illinois
Date City and State

Magistrate Nan R. Nolan
Name & Title of Judicial Officer

[signature] Nan R. Nolan
Signature of Judicial Officer

STATE OF ILLINOIS )
)
COUNTY OF COOK )

**AFFIDAVIT**

I, MATTHEW R. ALCOKE, first being duly sworn, state the following under oath:

**A. Introduction and Agent Background**

1. I make this affidavit in support of a criminal complaint against JACK MANN. As set forth herein, there is probable cause to believe that MANN has violated Title 18, United States Code, Section 373 (solicitation to commit a crime of violence). Specifically, there is probable cause to believe that between in or around August 2009 and continuing through on or about January 13, 2010, in the Northern District of Illinois, MANN intending that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, namely, Title 18, Unites States Code, Sections 111 (assault on or intimidation of a federal officer), 115(a)(1)(B) (threat to assault, kidnap, or murder a federal law enforcement officer with the intent to impede the officer's performance of official duties or with the intent to retaliate against the officer on account of her performance of official duties), and 1114 (killing or attempting to kill any officer or employee of the United States on account of the performance of their official duties), and under circumstances strongly corroborative of that intent, solicited, commanded, induced, and otherwise endeavored to persuade such other person to engage in such conduct, in violation of Title 18, United States Code, Section 373(a).

2. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. More

specifically, I have set forth only the facts that I believe are necessary to establish the requisite probable cause.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed as such for approximately thirteen years. I have been assigned to the FBI's Violent Crimes Task Force for approximately twelve years, where my duties include conducting investigations of bank robberies, kidnapings, extortions, and other violent crimes. The information contained in this affidavit is based on my personal knowledge, on information provided to me by other law enforcement officers, on information provided by a cooperating witness, and on information obtained from phone records, documents, and other records.

## B. Probable Cause

4. On or about December 21, 2009, an attorney representing a person hereinafter referred to as CW1[1] contacted the FBI and reported that on or about December 18, 2009, CW1 had advised the attorney that he/she was aware of a planned murder plot against a prosecutor and an "FBI agent." With the approval of CW1's attorney, the FBI subsequently met with and interviewed CW1.

5. Among other things, CW1 reported that he/she had been solicited by JACK MANN (hereinafter referred to as "MANN") to arrange for the murder of a federal prosecutor (hereafter referred to as "VICTIM 1") and "an FBI agent"[2] (hereafter referred to as "VICTIM 2"). CW1

[1] A review of CW1's criminal history reveals that he/she was convicted for a murder. The sentence for that murder, including a parole period, has been fulfilled. According to his/her attorney, CW1 has filed suit against the police agency in relation to that conviction, alleging that he/she was falsely arrested. To date, CW1 has not received monetary compensation from the FBI and has not been made any promises regarding compensation. FBI has expressed to CW1 that compensation will not be discussed until resolution of the matter.

[2] Further investigation has revealed that the "FBI agent" referred to by CW1 is in fact a Special Agent with the Drug Enforcement Administration.

understood from MANN that the murders of VICTIM 1 and VICTIM 2 were requested by INDIVIDUAL A, who is a defendant in a pending federal drug prosecution.

6. The FBI contacted VICTIM 1 and learned that he/she is presently an attorney actively employed by the United States Attorney's Office in the Northern District of Illinois and is the lead prosecutor in a case involving multiple defendants, one of whom is INDIVIDUAL A. The FBI also contacted VICTIM 2 and learned that he/she is presently actively employed as a Special Agent of the Drug Enforcement Administration ("DEA") and was directly involved in the DEA investigation which ultimately led to the arrest and prosecution of INDIVIDUAL A.

7. According to court records, INDIVIDUAL A was arrested and charged in approximately December 2008 and was subsequently released on bond pending resolution of the case in district court. As of January 13, 2010, INDIVIDUAL A is free on bond, per the bond order. The charges for which INDIVIDUAL A was ultimately indicted stem from the manufacture of a controlled substance.

8. On or about December 22, 2009, during an interview with CW1, the FBI learned that CW1 was introduced to MANN by a mutual friend in approximately Summer 2009. According to CW1, CW1 and MANN were introduced for the purpose of a potential drug transaction. After meeting MANN, CW1 learned that MANN was not able to supply drugs. CW1 further explained that he/she was first solicited by MANN about murdering two people near the end of August or the beginning of September 2009. According to CW1, at that time, MANN did not tell CW1 the names or positions of the intended targets. CW1 believed that MANN felt comfortable soliciting CW1 for these crimes because MANN had previously become aware of CW1's admitted ties to a Chicago street gang. In one of many conversations between CW1 and MANN, MANN also learned that CW1

had previously spent time in prison for a murder.

9. According to CW1, MANN explained to CW1 that a pending federal case involving drugs had been lodged against INDIVIDUAL A and that the "cartel" INDIVIDUAL A worked for wanted to get INDIVIDUAL A out of trouble. CW1 explained to FBI that he/she understood that the cartel wanted the case dropped. CW1 further explained to the FBI that MANN told CW1 that two people involved in INDIVIDUAL A's case needed to "disappear." In addition, MANN asked CW1 how much it would cost and in response, CW1 reported that it would cost approximately four kilograms of cocaine. CW1 indicated that, over the course of multiple conversations with MANN, CW1 indicated that he/she would be willing to do it.

10. According to CW1, despite MANN's solicitation, CW1 never had any intention of killing anyone; however, he/she continued to discuss the plot with MANN, hoping to convince MANN and/or INDIVIDUAL A to provide a down payment of approximately two kilograms of cocaine and, if obtained, absconding with the down payment and not committing the murder. To that end, CW1 entered into multiple in-person, mobile phone, and text messaging conversations with MANN about the murder plot from August or September through December 2009.

11. On or about December 18, 2009, after not having met any success in his/her attempts to collect a down payment of any kind, CW1 consulted with his/her attorney about notifying the authorities. As of the afternoon of January 13, 2010, CW1 has not had direct contact with INDIVIDUAL A; all of CW1' s communications about this matter have been with MANN.

12. According to CW1, during a meeting between CW1 and MANN sometime on or near Thanksgiving 2009, MANN wrote the names of the intended targets, VICTIM 1 and VICTIM 2, on two pieces of paper and provided them to CW1. According to CW1, it was then that CW1 learned

for the first time the victim's identities and their federal law enforcement employment. During this same meeting, MANN told CW1 that MANN conducted some research into the home addresses of VICTIM 1 and VICTIM 2 and that research revealed two possible addresses in towns near Chicago, Illinois, one of which may be the home address of VICTIM 2. The research reported by MANN to CW1 also revealed a possible link to a home address for VICTIM 1 in a town several hours' drive from Chicago, which MANN believed to be an incorrect link based on its distance from Chicago. At the time of the FBI interview, CW1 could not recall the victims' addresses MANN provided to him/her. As described below, CW1 later turned over these pieces of paper to FBI.

13. According to CW1, during a meeting between CW1 and MANN on or shortly after December 10, 2009, MANN provided CW1 with a set of papers which MANN said he printed after a visit to the office of the federal court clerk. MANN told CW1 that the papers represented a report of INDIVIDUAL A's pending court case, and MANN pointed out the name of the federal prosecutor, VICTIM 1. CW1 explained to the FBI that, in previous conversations with MANN, MANN was unsure how to spell VICTIM 1's name. Further, CW1 explained that MANN provided the court documents to CW1 in order to clarify the spelling of VICTIM 1's name so that – at MANN's request – CW1 would be able to conduct research to collect information about VICTIM 1, including his/her home address. CW1 turned over to the FBI both the abovementioned papers with VICTIM 1 and VICTIM 2's names on them and the court documents MANN gave CW1.

14. FBI's review of the court documents MANN gave to CW1 revealed that they appear to be a United States District Court case docket summary report for INDIVIDUAL A's pending case. A cover sheet maintained by the Office of the United States District Court Clerk regarding these documents is titled "Request for Copy/Certificate Services." The cover sheet has a stamp in the

upper right hand corner indicating that the request was paid for. The stamp also has a date of "DEC 10 2009." The cover sheet indicates that 18 pages were printed, at a cost of $0.10 per page. Next to the "Name" section of the cover sheet, the name "J. Mann" appears in handwriting. Next to the "Firm Name" section of the cover sheet, the words "Consulting / [INDIVIDUAL B]" appears in handwriting. It should be noted that INDIVIDUAL B is the last name of the attorney presently representing INDIVIDUAL A in the pending drug case.

15. FBI spoke with VICTIM 1 and learned that INDIVIDUAL A was initially represented in his/her pending drug case by INDIVIDUAL C. INDIVIDUAL C represented INDIVIDUAL A from the time INDIVIDUAL A was initially charged, up to and including December 7, 2009. While INDIVIDUAL C represented INDIVIDUAL A, INDIVIDUAL C and INDIVIDUAL A met with the government,[3] attempting to negotiate a plea agreement, on or about the following dates: January 30, 2009, February 5, 2009, April 17, 2009, May 19, 2009, and August 11, 2009. According to VICTIM 1, on or about October 27, 2009, VICTIM 1 sent a proposed plea agreement and cover letter[4] to INDIVIDUAL C. VICTIM 1 reported that he/she spoke telephonically with INDIVIDUAL C on or about November 17, 2009 or on or about November 18, 2009 regarding INDIVIDUAL A's pending drug case. During that phone call, INDIVIDUAL C advised that INDIVIDUAL A was not pleased

[3] Among those present for each of those meetings were VICTIM 1 and VICTIM 2.

[4] A review of the cover letter indicates that the proposed plea, addressed to INDIVIDUAL C as the attorney of record for INDIVIDUAL A, was dated October 27, 2009. It should be noted that the proposed plea agreement contemplated an anticipated advisory Guideline range of 168 to 210 months' imprisonment. In addition, the proposed plea agreement included a cooperation agreement, which contemplated that in exchange for INDIVIDUAL A's complete and truthful cooperation, the government, at the time of INDIVIDUAL A's sentencing, would make a motion, pursuant to § 5K1.1 and 18 U.S.C. § 3553(e), to depart to an agreed sentence of two-thirds of the low-end of the applicable advisory Guideline range.

with his/her plea agreement and that INDIVIDUAL A was firing INDIVIDUAL C. According to the docket in INDIVIDUAL A's pending drug case, on or about November 19, 2009, INDIVIDUAL C filed a motion to withdraw as counsel for INDIVIDUAL A and noticed the motion to withdraw for December 7, 2009. Further review of the docket reveals that on or about December 7, 2009, the Judge presiding over INDIVIDUAL A's drug case granted the motion to withdraw.

16. On or about December 22, 2009, CW1, at the direction and in the presence of the FBI, placed a consensually-recorded telephone call to MANN to telephone 630-546-9303. During the call, among other things, MANN expressed frustration that INDIVIDUAL A had been unclear lately about what INDIVIDUAL A wanted to occur. MANN speculated that INDIVIDUAL A may no longer want to go forward with the murder plans. MANN did not ask or advise CW1 to cease or desist any efforts on which CW1 may be working to procure the murders. To the contrary, MANN confirmed, at CW1's request, the spelling of VICTIM 1's last name during the recorded call. In the call, CW1 referred to the planned murders as "the contract," which, according to CW1, was a term he/she had used with MANN in previous conversations regarding killing the prosecutor and the agent.

17. On or about December 27, 2009, CW1 and MANN met in person. The meeting was recorded. In addition, FBI maintained covert surveillance of the meeting. During the meeting, MANN and CW1 discussed the murder plans further. Among other things, MANN commented to CW1 that INDIVIDUAL A was frustrated that INDIVIDUAL A was facing "13 years"[5] for the pending drug case in a proposed plea deal. After making unsuccessful attempts to call

[5] As stated in Footnote 4, the low end of the anticipated advisory Guideline range contemplated in the draft plea tendered to INDIVIDUAL C regarding INDIVIDUAL A's case, was 168 months' custody, which equates to 14 years.

INDIVIDUAL A on December 27, 2009, MANN sent text messages to INDIVIDUAL A. In addition, MANN and CW1 visited a residence that MANN indicated belonged to INDIVIDUAL A. A review of public record databases reveals that the residence is one of two that are listed as properties associated with INDIVIDUAL A. INDIVIDUAL A did not appear to be home. During the meeting, MANN expressed to CW1 MANN's frustration with INDIVIDUAL A over INDIVIDUAL A's recent lack of commitment to the murder plans and to INDIVIDUAL A's lack of response to MANN's attempts to contact him.

18. At one point in the recorded December 27 meeting between CW1 and MANN, CW1 told MANN, "I want to make fuckin' money, man." CW1 later explained to the FBI that CW1 was referring to the murder plot and profiting from it. MANN replied, "I know, but this guy's a fuckin' bitch… Dude wants us to take care of some shit, then all of a sudden… And now he's gonna play me for a bitch." CW1 understood MANN's use of the words "guy" and "dude" as referring to INDIVIDUAL A, and he/she understood MANN's use of "some shit" to refer to the murder plot.

19. Shortly after the exchange described above, MANN described to CW1 part of a previous conversation MANN had with INDIVIDUAL A. MANN described: "He (referring to INDIVIDUAL A) said, 'You give me a contract and you wanted me to start paying you now?' I'm like, 'Yeah.'" Then, MANN commented on INDIVIDUAL A's next statement as told by INDIVIDUAL A, "But that's not how the deal works. People put in their fuckin' time and they get a percentage of the fuckin' deal on the back end." MANN continued, "Then I (MANN referring to himself) said…bullshit on that. No, motherfucker (referring to INDIVIDUAL A), my time's worth money. If you want Jack Mann, you're gonna fuckin' pay!" MANN then told CW1, "He (referring to INDIVIDUAL A) sent me a text saying, 'You wanted to be paid up front…and that's why I'm not

involving you.'" Based on the purpose of their meeting that day and based on previous conversations with MANN, CW1 understood this to be MANN talking about a previous exchange between MANN and INDIVIDUAL A about MANN's agreement with INDIVIDUAL A to arrange for the murders.

20. As part of the present investigation, CW1 allowed the FBI to review the history of text messages on his/her phone which were made to and from MANN's two mobile phones. The review showed that there were multiple text message contacts between CW1 and MANN from September 10, 2009, to and including the day before the review, December 23, 2009. CW1 pointed out several of MANN's messages which CW1 advised were related to the murder plot. For example, on or about December 12, 2009, CW1 conducted a lengthy text message exchange with MANN's phone bearing number 630-546-9303, which contained the following text messages (among others):

MANN: So they r gonna get pics?

MANN: They need 2 have pics & plans final then we give a date & finalize deal.

CW1: K

21. CW1 explained to the FBI that, based on previous communications with MANN, CW1 understood "pics" to refer to photographs of VICTIM 1 and VICTIM 2 outside of their respective residences which were to be acquired by CW1 and provided to MANN and/or INDIVIDUAL A to show them CW1's commitment to executing the ultimate plan to murder VICTIM 1 and VICTIM 2. CW1 understood that the word "they" in MANN's second message referred to CW1 and to those who CW1 may hire to accomplish the picture-taking for CW1, such as his/her fellow gang members. CW1 understood that the word "we" in MANN's second message referred to MANN and INDIVIDUAL A. Finally, CW1's entry of "K" is a commonly-used text

message acknowledgment, shorthand for "OK."

22. A review of MANN's historical call detail records for telephone number 630-546-9303 obtained via court order[6] revealed approximately 668 text message communications from a phone believed to be used by[7] INDIVIDUAL A to MANN between August 1, 2009, and December 22, 2009, and approximately 1333 text message communications from MANN to INDIVIDUAL A between August 2, 2009, and December 27, 2009.

23. Specifically, call detail records reflect that on or about December 22, 2009, there were approximately 41 text message communications between MANN and INDIVIDUAL A (in both directions) which started at approximately 6:15 p.m. CW1 and MANN had made plans to meet and/or talk about the planned murders just a couple of hours before that time. The recorded call between CW1 and MANN in which MANN can be heard typing on a mobile phone keypad occurred at approximately 6:47 p.m. and ended at approximately 6:54 p.m. An outbound text message from MANN to INDIVIDUAL A was registered on the network as being sent approximately 11 minutes later.

---

[6] On or about December 30, 2009, Acting Chief Judge Matthew F. Kennelly signed two separate orders for information relating to two telephone numbers associated with MANN, namely 630-546-9303 and 773-798-6818. Some of CW1's contact with MANN on telephone number 630-546-9303 has been described above. According to CW1 and as corroborated by a review of phone records and text messages, CW1 has also been in contact with MANN on telephone 773-798-6818 specifically in relation to the present solicitation.

[7] In a text message sent from MANN to CW1 on or about December 22, 2009, MANN provided CW1 with INDIVIDUAL A's cell phone number. Specifically, among other texts sent that day, MANN wrote, "630-915-0802 is his cell. Call him now & leave a message. Tell him he is going to see him @ home soon w Jack." In addition, the drug investigation regarding INDIVIDUAL A revealed that one of INDIVIDUAL A's known cell phones was 630-915-0802. Further, Affiant has reviewed the report of INDIVIDUAL A's arrest prepared by the DEA. In that report, INDIVIDUAL A advised DEA that his/her phone number was 630-915-0802.

24. On or about December 30, 2009, Magistrate Judge Sidney I. Schenkier signed a search warrant to be served on Sprint PCS – the telephone provider for MANN's 630 telephone number for the content of text messages received to and from the 630 telephone. The results of that search warrant did not provide the content of the text message exchanges. According to Sprint representatives, Sprint no longer maintains text message content on their servers.

**C. Conclusion**

25. Based upon the information above, I believe there is probable cause that JACK MANN violated Title, 18 United States Code, Section 373 (solicitation to commit a crime of violence) in that he intend that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, namely, Title 18, Unites States Code, Sections 111 (assault on or intimidation of a federal officer), 115(a)(1)(B) (threat to assault, kidnap, or murder a federal law enforcement officer with the intent to impede the officer's performance of official duties or with the intent to retaliate against the officer on account of her performance of official duties), and 1114 (killing or attempting to kill any officer or employee of the United States on account of the performance of their official duties), and under circumstances strongly

corroborative of that intent, solicited, commanded, induced, and otherwise endeavored to persuade such other person to engage in such conduct, in violation of Title 18, United States Code, Section 373(a).

FURTHER AFFIANT SAYETH NOT.

Matthew R. Alcoke
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
on this 13th day of January 2010

United States Magistrate Judge